# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| CORT THOMAS, as the Receiver for Carnegie Development, LLC, et al, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:24-cv-512 |
| KHUDABUKSH K. WALJI, LAW OFFICE OF K. WALJI, ESQ., P.C., LAW OFFICE OF JUSTIN GUENLEY PLLC, JUSTIN M. GUENLEY, JOYCE W. LINDAUER, JOYCE W. LINDAUER ATTORNEY, PLLC, RANDY P. MARX, THE MARX FIRM, LLC, WILLIAM V. MCMURRY, Individually and d/b/a MCMURRY LEGAL, PLLC, MCMURRY LAW, PLLC, MCMURRY & MCMURRY, LLP, STEVEN C. METZGER, METZGER LAW PLLC, and METZGER & MCDONALD, PLLC, | § § § § § § § § § § § § | |
| Defendants. | | |

## FIRST AMENDED COMPLAINT[1]

Cort Thomas, in his capacity as the court-appointed Receiver, files this Original Complaint against Khudabuksh K. Walji, Law Office of K. Walji, Esq., P.C., Justin M. Guenley, Law Office of Justin Guenley PLLC, Joyce W. Lindauer, Joyce W. Lindauer Attorney, PLLC, Randy P. Marx, The Marx Firm, LLC, William V. McMurry individually and d/b/a McMurry Legal, PLLC, McMurray Law, PLLC, McMurry & McMurry, LLP, Steven C. Metzger, Metzger Law PLLC,

---

[1] The only change in this First Amended Complaint is correction of a typographical error in the date included in paragraph 142.

**ORIGINAL COMPLAINT**                                                                 **Page 1**

and Metzger & McDonald, PLLC (collectively, "Defendants").    In support, the Receiver respectfully shows the Court the following:

## I.
## SUMMARY

1.    This lawsuit seeks the recovery of more than $3.5 MM paid to lawyers who assisted in the operation of various "Receivership Entities" (defined below).  Payments to these lawyers were made by the Receivership Entities with intent to defraud the Entities' creditors, including investors whose funds were used to make the payments.  The payments were made while the transferring Entities were insolvent, after significant and numerous lawsuits had been filed against them, while the Entities were concealing assets and transfers, and without the exchange of reasonably equivalent value.  Further, these lawyers each violated their duty of care and fiduciary duties owed to the Receivership Entities that they represented.

2.    Standing in the shoes of the Receivership Entities' creditors for purposes of the claims asserted below, and for the benefit of the Entities' creditors, including the investors, the Receiver seeks to recover the funds transferred to the defendants named herein.

3.    Similarly, on behalf of the Receivership Entities represented, respectively, by Defendants, the Receiver sues each for the damages proximately caused by the negligence of each.

## II.
## PARTIES

4.    Plaintiff Cort Thomas, in his capacity as Receiver ("Receiver") as defined below, is an individual who resides in the State of Texas.

5.    Defendant Khudabuksh K. Walji is an individual who may be served with process at Law Office of K. Walji, P.C., 2034 Plantation Bend Drive, Sugar Land, Texas 77478, or wherever else he may be found.

6.      Defendant Law Office of K. Walji, Esq., P.C. is a domestic professional corporation which may be served with process through its registered agent Khudabuksh K. Walji, 10701 Corporate Drive, Suite 350, Stafford, Texas 77477, or wherever else it may be found.

7.      Defendant Justin Guenley is an individual who may be served with process at Law Office of Justin Guenley, PLLC, 3050 Post Oak Blvd., Suite 1350, Houston, Texas 77056, or wherever else he may be found.

8.      Defendant Law Office of Justin Guenley, PLLC, is a domestic limited liability company which may be served with process through its registered agent Justin Guenley, 1110 E. Nasa Parkway, Suite 305, Houston, Texas 77058, or wherever else it may be found.

9.      Defendant Joyce W. Lindauer is an individual who may be served with process at Joyce W. Lindauer Attorney, PLLC, 1412 Main Street, Suite 500, Dallas, Texas 75202, or wherever else she may be found.

10.     Defendant Joyce W. Lindauer Attorney, PLLC, is a domestic limited liability company which may be served with process through its registered agent Crescere Group, LLC, 3530 Forest Lane, Suite 192, Dallas, Texas 75234, or wherever else it may be found.

11.     Defendant William V. McMurry, individually, and d/b/a McMurry Legal, PLLC, is an individual who may be served with process at 508 W. Lookout Dr., Ste. 14-74, Richardson, Texas 75080-2176, or wherever else he may be found.

12.     Defendant McMurry Law, PLLC, is a domestic limited liability corporation, which may be served with process through its registered agent Angela McMurry, 2336 Vaquero Ln, Carrollton, Texas 75010, or wherever else it may be found.

13.     Defendant McMurry & McMurry, LLP, is a domestic limited liability partnership, which may be served with process at 2912 Whitemarsh Circle, Richardson, Texas 75080, or wherever else it may be found.

14.     Defendant Randy P. Marx is an individual who may be served with process at The Marx Firm, LLC, 5310 Harvest Hill Rd., Suite 192, Dallas, Texas 75230-58458, or wherever else he may be found.

15.     Defendant The Marx Firm, LLC, is a domestic limited liability company which may be served with process through its registered agent Randy P. Marx, 5430 LBJ Freeway, #1200, Dallas, Texas 75240, or wherever else it may be found.

16.     Defendant Steven C. Metzger is an individual who may be served with process at Steven C. Metzger Law PLLC, 3626 N. Hall St., Ste. 800, Dallas, Texas 75219, or wherever else he may be found.

17.     Defendant Metzger Law, PLLC, is domestic limited liability corporation, which may be served with process through its registered agent, Steven C. Metzger, Steven C. Metzger Law, PLLC d/b/a Metzger Law, PLLC, 3626 N. Hall St., Ste. 800, Dallas, Texas 75219, or wherever else it may be found.

18.     Defendant Metzger & McDonald, PLLC, is domestic limited liability corporation, which may be served with process through its registered agent, Steven C. Metzger, Steven C. Metzger Law, PLLC d/b/a Metzger & McDonald, PLLC, 3626 N. Hall St., Ste. 800, Dallas, Texas 75219, or wherever else it may be found.

## II.
## JURISDICTION AND VENUE

19.     The court has ancillary subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the November 29, 2023 Order Appointing Receiver ("Receivership Order") issued in the

"Underlying Lawsuit" (defined below). Pursuant to the Receivership Order,[2] the Court has assumed exclusive custody and control over all Receivership Assets, which include all claims owned by the Receivership Entities. This lawsuit is filed pursuant to the Receiver's execution of his duties as defined in the Receivership Order to recover funds owed to the Receivership Entities, and accordingly, ancillary jurisdiction exists regardless of amount in controversy, diversity, or any other factor.[3]

20.     Further, the Court has subject matter jurisdiction and personal jurisdiction over each of the Defendants pursuant to 28 U.S.C. § 1692 and 28 U.S.C. § 754.

21.     Venue in this District is proper pursuant to 28 U.S.C. §1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in Dallas, Texas. Moreover, because ancillary jurisdiction exists, ancillary venue also exists.[4]

### III.
### CONDITIONS PRECEDENT

22.     All conditions precedent to the filing of this Original Complaint have been performed or have occurred.

### V.
### BACKGROUND FACTS

**A.     The Receivership**

23.     As discussed below, the SEC filed a lawsuit against Timothy Barton and others, in which it asserted that the defendants had violated SEC regulations in connection with securities offerings regarding real property investments.[5] The lawsuit was styled *SEC v. Barton*, *et al.*, Cause

---

[2] A true and correct copy of the Receivership Order is attached as **Exhibit A** and is incorporated by reference.

[3] *Crawford v. Silette*, 608 F.3d 275, 278 (5th Cir. 2010).

[4] *SEC v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004).

[5] Timothy Barton, Michael Fu, and Stephen T. Wall have also been indicted in connection with their role in investment fraud.

---

No. 3:22-CV-02188-X, and is pending in the United States District Court for the Northern District of Texas, (the "Underlying Lawsuit.").

24.     In the Underlying Lawsuit, the SEC alleged Barton, through various entities he controlled, misappropriated funds transferred by investors for the purchase of specific real estate properties (the "Investments").[6]

25.     On October 18, 2022, in the Underlying Lawsuit and pursuant to the SEC's motion, Cort Thomas was appointed as Receiver for various "Receivership Entities."  On November 29, 2023, following an additional motion, briefing, and an evidentiary hearing, Mr. Thomas was reappointed as Receiver, pursuant to a new Receivership Order (the "Receivership Order"), for a substituted set of Receivership Entities.[7]

**B.    Fraudulent Concealment and Diligent Efforts to Discover the Claims Asserted**

26.     Pursuant to his investigation and despite every effort by Defendant Barton to conceal and withhold information, including access to information related to the Receivership Entities' books and records, the Receiver has discovered claims for the recovery of Receivership Assets, and asserts those claims below.

---

[6] A true and correct copy of the SEC's Complaint is attached as **Exhibit B,** and its allegations are incorporated herein by reference.

[7] The motion for appointment and supporting evidence, the renewed motion for appointment, and supporting evidence, and all evidence admitted in support of the motion for reappointment are also incorporated herein by reference. *See* Underlying Lawsuit, Dkt. Nos. 6, 7, 309, 310.  As provided in the Receivership Order, the Receivership Entities are: 126 Villita, LLC, 2999TC Acquisitions LLC, 2999TC JMJ CMGR, LLC (Delaware), AVG West, LLC, BEE2019, LLC, BM318, LLC, Broadview Holdings Trust, Carnegie Development, LLC, D4DS LLC, D4FR LLC, D4IN, LLC (Texas), D4KL, LLC, D4MC, LLC (Texas), D4OP, LLC, DJD Land Partners, LLC, Enoch Investments, LLC, FHC Acquisition, LLC, Gillespie Villas, LLC, Goldmark Hospitality, LLC, HR Sterling, LLC, JMJ Acquisitions, LLC, JMJ Development LLC (f/k/a JMJ Development, Inc.), JMJ Hospitality, LLC, JMJ VC Management, LLC, JMJAV, LLC, JMJD4, LLC (Delaware), JMR100, LLC, LaJolla Construction Management, LLC, LC Aledo TX, LLC, LDG001, LLC, Lynco Ventures, LLC, Mansions Apartment Homes at Marine Creek, LLC, Marine Creek SP, LLC, MO 2999TC, LLC, Northstar PM, LLC (Texas), Orchard Farms Village, LLC, Ridgeview Addition, LLC (Texas), Seagoville Farms, LLC, SF Rock Creek, LLC, TC Hall, LLC, Titan Investments, LLC a/k/a Titan 2022 Investments, LLC, Venus59, LLC, Villita Development, LLC, Villita Towers, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, WRL2019, LLC (Texas).

---

**ORIGINAL COMPLAINT**                                                      **Page 6**

27.     The Receiver's claims, including the fraudulent nature of the Transfers discussed below, were actively concealed, and despite diligence, the Receiver was not able to discover his claims until recently.

28.     More specifically, Barton withheld access credentials to the Receivership Entities' servers, accounting system, and email accounts until the Court ordered him to provide that information to the Receiver.  Barton also utilized IT professionals to frustrate any investigation into his and the Receivership Entities' finances by transferring information to cloud-based servers and directing the IT professionals to withhold access from the Receiver.

29.     Even after he obtained access to certain QuickBooks accounts, however, the Receiver and his accountants were unable to fully discover the claims asserted herein because, among other things, (a) the QuickBooks records were incomplete, which necessitated obtaining and evaluating thousands of pages of bank records and financial and related records from title companies and other persons and entities; (b) Barton operated and controlled more than 160 entities, which were initially all Receivership Entities, and commingled assets between and among those entities extensively rendering evaluation of the financial records and Transfers complex and time-consuming; (c) entries in the Receivership Entities' accounting records appeared in many instances to have been made to conceal the actual activity that occurred, for instance by moving money through many accounts in one day to conceal the origin of the funds; (d) the Receiver could not (and still cannot) access electronic communications between the Receivership Entities and Defendants as a result of Barton's complaints about potential personal privilege in those documents, and Barton refused to agree to, and opposed the Receiver's proposal, for a privilege protocol to review those materials; (e) because Barton interfered with and precluded the sale of any real property, once the Court established the privilege protocol, the Receivership Estate lacked

funds to pay an IT vendor and reviewing counsel to perform the privilege review; (f) the Receiver's investigation into the factual basis for the claims was delayed and impeded at every turn by Barton's refusal to comply with the Receivership Order by providing the information required of him; (g) the Fifth Circuit's vacatur of the original Receivership Order and instruction to this Court to consider a new Receivership Order necessitated focusing on tracing to identify which Receivership Entities received or benefitted from Investor Funds; and, (h) the Receiver and his counsel were required to address other matters required to perform the Receiver's appointment, for instance, efforts to continue the operations of the Amerigold Suites, responding to pressing creditors who sought to lift the litigation stay, and in several instances, mediating with them, the lengthy summary judgment practice involving a lender's interest in four apartment properties, and addressing Barton's repeated motions and appeals intended to stay administration of the receivership.

30.    Although the Receiver asserts claims for the recovery of certain fraudulent transfers below, the precise manner, dates, and amounts, and recipients of additional fraudulent transfers is known only to Defendants, and absent additional discovery and a detailed analysis by an expert, the Receiver is unable to discover those fraudulent transfers.

**C.    Numerous Receivership Entities Received Investor Funds**

31.    As set forth in the Commission's Complaint, in the Underlying Lawsuit the SEC alleged that from approximately March 2017 through June 2019 Barton raised approximately $26 million from over 100 investors (the "Investors" and "Investor Funds") in unregistered, fraudulent securities offerings related to Texas real-estate investments.[8]

---

[8] *See* SEC Complaint, ¶ 1.  Barton has not answered the SEC's Complaint and the Underlying Lawsuit is stayed while until the criminal charges against Barton are resolved.  *See* Dkt. 1, Underlying Lawsuit.

**ORIGINAL COMPLAINT**                                                                                      **Page 8**

32.     To implement his scheme, Barton partnered with Stephen T. Wall, an experienced Texas home builder, and "Michael" Fu, a Chinese businessman, to offer and sell investment loans issued by a series of single purpose "Wall" entities (the "Wall Entities").  In connection with the scheme, Barton also formed and controlled Carnegie Development, LLC ("Carnegie"),[9] which served as the managing member of each of the Wall entities.  Carnegie, on behalf of each Wall Entity, signed the respective loan agreements with each Investor.

33.     Upon information and belief, with the assistance of one or more of the Defendants, Barton formed and controlled the Wall Entities.  Barton promised that the Investor's Funds, together with funds from the Wall Entities themselves, would be used to purchase specific parcels of land at specific prices set forth in the offering materials.  Barton promised he would then develop that land into residential lots, and Wall would build homes on the lots and sell them.

34.     Once the loan agreements were executed, the Investors generally transferred their Investment Funds either to a bank account in the name of the respective Wall Entity in which they were investing, Carnegie, or in a few instances, accounts in the name of other Receivership Entities.

35.     The Wall Entities promised Investors they would receive their principal back in two years along with annual interest payments.

36.     Upon information and belief, with the assistance of one or more of the Defendants, Barton, Wall, and Fu, however, inflated the land purchase prices in the offering materials, which enabled them to raise more money from Investors; overstated the value of the assets securing the investments; and concealed that the Wall Entities were not actually contributing any funds.

37.     Barton, through Receivership Entities including but not limited to JMJ

---

[9] Later, Carnegie Development, Inc. was also formed, again, in furtherance of Barton's fraud.

**ORIGINAL COMPLAINT**                                                                 **Page 9**

Development, LLC, Broadview Holdings, LLC, Goldmark Hospitality, LLC, Carnegie Development, LLC, and JMJAV, LLC, then misappropriated nearly all the Investor Funds, misusing them to, among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions to Fu, pay expenses associated with unrelated real estate development projects, pursue and defend litigation involving other properties, including paying legal fees related to those lawsuits, and fund his lifestyle.

38.    Through various Receivership Entities, Barton spent or otherwise misappropriated approximately $23.7 million of Investor Funds.

39.    The Wall Entities were left with little or no assets, the projects were not developed, and the Investors did not receive their promised returns.

**C.    Barton Used Litigation As a Business Tactic**

40.    Using Investor Funds and often additional funds from third-party lenders, Barton used a multitude of non-Wall Entity Receivership Entities to purchase, or at least attempt to purchase, additional properties.

41.    Upon information and belief, one or more of the Defendants assisted Barton in creating and organizing many of the Receivership Entities, which were used for these purposes.

42.    Typically, one Receivership Entity would contract to purchase a specific property. That entity, or another Receivership Entity, would make one or more initial payments in furtherance of the purchase.

43.    In many instances, the purchasing Receivership Entity later defaulted, usually by failing to make payments due on the original sales contract, or by failing to perform some extension granted with respect to the sale.

44.    These defaults occurred regularly, because Barton was using Investor Funds to

contract for these purchases, or in some instances, using properties purchased with Investor Funds or which benefited from Investor Funds, as collateral for third-party loans. The Investor Funds, however, which were the primary if not sole source of funds available to Barton and the Receivership Entities during the relevant time period, were not sufficient for the Receivership Entities to satisfy the obligations on these purchases while also funding Barton's lifestyle, the operation of the Receivership Entities, and legal fees incurred regarding litigation discussed below. Accordingly, the purchasing Receivership Entity would default on the purchase contract.

45.    Following default, Barton would engage in litigation to stay foreclosure, allege some wrongful conduct on the part of the seller or lender, or otherwise tie up ownership of the property at issue.

46.    Upon information and belief, most if not all of these lawsuits were intended to hinder, delay or defraud creditors.

47.    As one example and as explained by a Bankruptcy Judge, one Receivership Entity defaulted eight times on purchase obligations and then, with the assistance of counsel discussed below, "sought delay by filing litigation."[10] In a decisive order, the judge found that "enough is enough"[11] and granted the lender's motions by which it obtained clear title to the property.

48.    Barton needed legal assistance to pursue these lawsuits, and he found it in several attorneys who were willing to ignore their knowledge or notice of the source of the funds with

---

[10] *See In re 2999TC Acquisitions, LLC*, Case No. 21-31954 (Bankr. N.D. Tex.) [Bankr. Dkt. 283, p. 5]. In the same order, the Bankruptcy judge described, in 15 pages, Barton and the Receivership Entities' years and years of delays, evasive and dishonest tactics. The Bankruptcy Judge also concluded that the witnesses offered in support of Barton's and the Receivership Entities' arguments were not credible.

[11] The creditor involved in that same litigation explained, just in regards to that one property, Barton and the Receivership Entity "filed four lawsuits in three courts, made knowingly false allegations against HNGH's representatives, filed an emergency bankruptcy case in an effort to prevent HNGH from taking ownership of the Property, breached agreed orders, intentionally delayed the resolution of hearings, and made misrepresentations in pleadings and in court in an effort to cause further delays adverse to HNGH."

---

**ORIGINAL COMPLAINT**                                                          **Page 11**

which they were paid, the fraud underlying the Receivership Entities' efforts to obtain the Investor Funds, and numerous other similarly suspicious or wrongful facts.

**D.    Transfers to the Lawyer Defendants**

49.    The Defendants in this lawsuit, Khudabuksh K. Walji ("Walji"), Walji's "partner" Justin M. Guenley ("Guenley"), Joyce W. Lindauer ("Lindauer"), Randy P. Marx ("Marx"), William Vance McMurry ("McMurry"), and Steven C. Metzger ("Metzger") and their respective legal entities, are attorneys who were happy to assist Barton, while being paid from Investor Funds funneled through various Receivership Entities.

50.    At all relevant times, the primary or only funds available to pay Defendants were Investor Funds.

51.    Upon information and belief, and except for Goldmark Hospitality, LLC which operated the Amerigold Suites (generally at a loss) none of the Receivership Entities generated any net income for payment of even ordinary operating expenses.

52.    Between August of 2019 and August of 2022, in total, these Defendant lawyers received not less than $ 3.5 MM from various Receivership Entities (the "Transfers").

53.    Each Transfer was made with actual or constructively fraudulent intent by the transferring Receivership Entity.

**i.    Walji**

54.    Walji, who holds himself out as a "U.S. & International Legal Advisor" began representing or advising Barton and Receivership Entities, not later than June of 2020.

55.    Walji contends that effective January 1, 2022, "JMJ Development Group" retained him as "Outside General Counsel," on a "non-exclusive full-time basis."

56.    Pursuant to an undated letter from Walji to Barton, Walji unilaterally "confirmed"

Barton's agreement to pay Walji $75,000 per month plus expenses ($900,000 per year), with additional charges for Walji's associate, Amada Paige, billed at $275.00 per hour. The letter also stated that Walji would "have an office space at 2999 Turtle Creek Blvd, Dallas, Texas 75219 allocated exclusively to me as a satellite law office at no charge." Neither Barton nor anyone on behalf of "JMJ Development Group" signed the letter.

57.    Notably, although Walji contends that in January 2022, Barton had agreed to retain him as outside general counsel at the outrageous rate of $75,000 per month, he rarely received that amount when paid by any Receivership Entity.

58.    Between June 2, 2020 and July 6, 2022, Transfers in an amount not less than $1,105,000 made from various Receivership Entities were made to Walji. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Walji is attached as **Exhibit C**.

59.    Transfers made to the Law Office of K. Walji, P.C. were made for the benefit of Walji.

60.    Upon information and belief, Walji is a subsequent transferee of any Transfer made first to Law Office of K. Walji, P.C. to or Law Offices of Justin Guenley, PLLC.

**ii.    Guenley**

61.    Walji also contends that at some point, he associated with another attorney, Justin Guenley ("Guenley"). Guenley asserted that by early 2021, he and Walji were in the process of forming a partnership.

62.    Between 2021 and 2022, transfers in an amount not less than $1,520,449.94 made from various Receivership Entities were made to Guenley at the Law Offices of Justin Guenley, PLLC A true and correct copy of a summary reflecting the dates, amounts, manner of transfer,

and the specific entity that transferred funds to Guenley is attached as **Exhibit D.**

63.    Transfers made to the Law Offices of Justin Guenley, PLLC, were made for the benefit of Guenley, or upon information and belief, Guenley was a subsequent transferee of any Transfer made to the Law Offices of Justin Guenley PLLC.

64.    In addition or in the alternative, Transfers made to Guenley or Law Offices of Justin Guenley, PLLC were also made for the benefit of Walji.  In the further alternative, Walji is a subsequent transferee of all Transfers made to the Law Offices of Justin Guenley, PLLC.

65.    Guenley provided no services of any kind to any Receivership Entity.

66.    On the contrary, Guenley informed the Receiver that he did not represent any Receivership Entities, but instead that "his client has filed suit against Mr. Barton and some of the receivership entities for funds owed to my client, in two separate suits."

67.    Guenley, while associated with Walji, thus accepted a representation that was directly contrary to Barton, JMJ Development, LLC, and other Receivership Entities, and filed two lawsuits (the "Dowdall Lawsuits") against his partner's clients. [12]

68.    Guenley characterized the direct conflict of interest as "an oversight."

69.    Prior to the date on which the Dowdall Lawsuits were filed, the Law Offices of Justin Guenley, PLLC had received not less than $1,520,449.94 from various Receivership Entities.

---

[12] *Dowdall v. 2999 TC JMJ Mgr., LLC and Tim Barton,* Cause No. 22-14770, in the 193rd District Court of Dallas County, filed on October 21, 2022; and *Dowdall v. 2999 TC CMGR, LLC and JMJ Development, LLC,* Cause No. 22-1 5648, in the 193rd District Court of Dallas County, filed on November 3, 2022 (collectively, the "Dowdall Lawsuits").  The Dowdall lawsuits both focused on the payment defaults by the respective defendants.  In the first lawsuit, Dowdall alleged that in September 2019 he had loaned $2MM to 2999 TC JMJ Mgr. for use in constructing a hotel (the "Mandarin") and that Barton had personally guaranteed the loan.  The loan purportedly required monthly interest only payments until maturity, on March 13, 2020.  Dowdall through Guenley alleged defendants had failed to make a single interest payment and had also defaulted on the principal amount that became due at maturity.

### iii.    McMurry and Marx

70.    McMurry and Marx officed in the same building and office suite as Barton and the Receivership Entities.  Neither paid rent for their office space.

71.    Upon information and belief, Marx began working for Barton no later than July 2020.

72.    Upon information and belief, McMurry began working for Barton no later than the summer of 2019.

73.    McMurry and Marx served as Barton's general counsel, if not in title, then in function.

74.    On information and belief, Marx drafted company agreements and formation documents by and through which various Receivership Entities were created, controlled and operated, and promissory notes, loan agreements, real estate purchase agreements, and similar contracts, by which Receivership Entities, using in many–if not most—instances Investor Funds, purchased real estate.  He also provided advice regarding creating new entities, how to structure management and control over the entities, and real estate purchases and transactions.

75.    McMurry worked on most litigation matters and upon information and belief, coordinated with other lawyers retained to work on the litigation.  McMurry received Transfers in some instances through payroll, which was run through Receivership Entity, HR Sterling, LLC.

76.    Between August 2019 and October 2022, Transfers in an amount not less than $172,078.46 made from various Receivership Entities were made to or for the benefit of McMurry.  A true and correct copy of a summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to McMurry is attached as **Exhibit E**.

77.    Transfers made to McMurry Legal, PLLC, McMurry Law, PLLC, and McMurry &

---

McMurry, LLP were made for the benefit of McMurry. Or in the alternative, upon information and belief, McMurry is a subsequent transferee of any Transfer made first to McMurry Legal, PLLC, McMurry & McMurry, LLP or McMurry Law, PLLC.

78.     Between July 2020 and September 2022, Transfers in an amount not less than $130,124.02 made from various Receivership Entities were made to Marx or for the benefit of Marx. A true and correct copy of a summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Marx is attached as **Exhibit F**.

79.     Transfers made to The Marx Firm, LLC, were made for the benefit of Marx. Or in the alternative, upon information and belief, Marx is a subsequent transferee of any Transfer made first to the Marx Firm, LLC.

80.     In some instances, Marx also received Transfers from title companies that provided services in connection with Receivership Entities' purchases and sales of real estate. These Transfers represented funds owned by the respective Receivership Entity involved in the transaction. The total of Transfers made to Marx by title companies is unknown, but as with all Defendants in this case, the Receiver seeks the recovery of all amounts received, directly or indirectly by Marx.

**iv.    Metzger**

81.     Upon information and belief, Metzger began representing Barton and various Receivership Entities no later than May 2019.

82.     On information and belief, Metzger was retained to assist McMurry, Walji, and Lindauer (discussed below) in defending or prosecuting various lawsuits. In at least one instance, he also represented Barton individually (in contempt proceedings) in connection with an involuntary bankruptcy proceeding filed by the Investors.

83.     Although retained to represent Barton, individually at least in one instance, Metzger was only paid by various Receivership Entities.

83.     Between July 2020 and September 2022, Transfers in an amount not less than $279,318.09 made from various Receivership Entities were made to Metzger or for the benefit of Metzger.  A true and correct copy of a summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Metzger is attached as **Exhibit G**.

84.     Transfers made to Metzger Law PLLC, and Metzger & McDonald, PLLC were made for the benefit of Metzger, or in the alternative, upon information and belief, Metzger is a subsequent transferee of any Transfer made first to Metzger Law PLLC, and Metzger & McDonald, PLLC.

**v.    Lindauer**

85.     Defendant Lindauer represented Barton and numerous Receivership Entities in several bankruptcy matters, including the bankruptcy proceedings for 2999 TC Acquisitions, LLC and BM318, LLC, as well as an involuntary bankruptcy proceeding filed by certain Investors against most of the Wall Entities.

86.     Between December 2018 and September 21, 2022, Transfers in an amount not less than $550,466.91 were made to or for the benefit of Lindauer.  A true and correct copy of a summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Lindauer is attached as **Exhibit H**.

87.     Transfers made to Joyce W. Lindauer Attorney, PLLC were made for the benefit of Lindauer.  In the alternative, upon information and belief, Lindauer is a subsequent transferee of any Transfer made first to Joyce W. Lindauer Attorney, PLLC.

**E.      The Transfers Were Made With Fraudulent Intent**

88.      In many instances, the respective Receivership Entities that made the Transfers to each Defendant did not receive reasonably equivalent value from the respective transferee Defendants.  Instead, Defendants were often providing services to Barton individually, or to one or more Receivership Entities, while receiving the Transfer from a different Receivership Entity, which accordingly, received no value for any services provided by Defendants.

89.      Each Receivership Entity made the Transfers to Defendants to continue the fraud Barton and the Receivership Entities were committing against the Investors, lenders, and other creditors.  In some instances, Defendants' services were utilized, upon information and belief with Defendants' knowledge, solely to hinder, delay or defraud creditors.

90.      Upon information and belief, based on Defendants' advice, the Receivership Entities intentionally engaged in litigation, much of which was baseless, to avoid paying their creditors or otherwise to delay, hinder, or defraud their creditors.

91.      At the time each Transfer was made to each respective Defendant, the transferring Receivership Entity was unable to or pay its debts as they became due.

92.      Further, debts owed by and claims against each Receivership Entity greatly exceeded each Entity's assets (if any).

93.      At the time each of the Transfers were made, several of the Receivership Entities, including the Wall Entities, were, or had been, subject to bankruptcy proceedings.  Indeed, in the 18 months before October 29, 2021, Receivership Entities or their affiliates had filed for bankruptcy or were involuntarily placed in bankruptcy no fewer than 16 times.

94.      Similarly, at the time each of the Transfers were made, several of the Receivership Entities, including the Wall Entities, had been sued.

95.    Transfers made to the Defendants also rendered the Receivership Entities unable to pay a myriad of additional creditors, including the Investor.

96.    Defendants knew or should have known that the Transfers each received were made with actual fraudulent intent.

**F.    Defendants Received Fraudulent Transfers While In Possession of Facts Negating Good Faith**

97.    The notice or knowledge possessed by each Defendant regarding the actual or constructive fraudulent intent with which the Transfers were made is known to each respective Defendant. Nonetheless, based on their respective roles, their participation in Barton's litigation strategy, and other activities, each had at least inquiry notice of the fraudulent intent underlying the Transfers made to each and to each other.

98.    Walji advised several Wall Entities and JMJ Holdings, LLC, in a lawsuit instituted in March of 2020 by several Investors, *Yun et al, v. Wall012*, et al., Cause No. DC-20-04575 in the 44th District Court, Dallas County, Texas (the "Yun Lawsuit").

99.    McMurry was also counsel of record in the Yun Lawsuit and Metzger assisted in the defense, in which the Investors alleged Barton and the defendant Receivership Entities had failed and refused to invest the Investor funds as promised, failed to make "interest" payments, or otherwise return the Investors' Funds.

100.    Although his name does not appear in the docket of each case, Walji also contends he "was consulted as required" in a myriad of litigation in which various Receivership Entities and Barton were sued or sued others, in connection with defaults on real estate purchases, and related issues.

101.    Similarly, Lindauer, McMurry, Metzger, and Marx appeared as counsel of record in many of these lawsuits and knew the Receivership Entities engaged in litigation solely to hinder,

delay, or defraud creditors while the Receivership Entities were not paying their bills as they became due.   Upon information and belief, each Defendant advised each respective Receivership Entity to embark on "litigation as a tool" to hinder, delay or defraud creditors.

102.    For instance, McMurry, Walji, Lindauer, and Metzger worked on a lawsuit filed by a lender who sued Barton individually and several Receivership Entities in connection with a $4M loan made regarding a property purchased in part, with Investor Funds.  The Entities defaulted on the loan, and the lender, Leland Hodges, obtained a summary judgment against the Entities and Barton as guarantor.

103.    Similarly, McMurry, Metzger, and Walji represented Barton individually and various Receivership Entities in litigation filed by a different creditor, David Ramolia, regarding a $3M loan made in connection with a separate property.  Again, the creditor prevailed, and these Defendants had knowledge or notice of Barton and the Receivership Entities' illicit use of the lender's funds, as well as the Receivership Entities' inability to pay debts as they became due.

104.    By so advising each Receivership Entity, each Defendant placed his or her own interests—in, among other things, receiving continuing payments from insolvent Receivership Entities—above the interests of their clients.

105.    Upon information and belief, each Defendant was also privy to information underlying the SEC's claims by which they had, at a minimum, notice of the fraudulent intent behind the Transfers each received.

106.    Upon information and belief, not later than December of 2020, Barton, the Receivership Entities, and Defendants learned of the SEC's investigation.

107.    In March 2021, Barton sat for a deposition by the Commission.

108.     Walji represented Barton during the deposition and was thus privy to the

Commission's questions and Barton's answers about his control, role with, and ownership of various Receivership Entities, Barton's and Receivership Entity assets and bank accounts, and the investments made by the Wall Investors.

109.    According to Walji, McMurry also participated in preparing Mr. Barton for his deposition and defending against the SEC's inquiry and was thus also aware of the subject of the investigation, as well as the information disclosed during Barton's deposition.

110.    Walji also represented that Metzger assisted in defending against the Commission's investigation.

111.    Upon information and belief, Marx and Lindauer were also aware of the SEC's investigation, as well as the information about which the SEC inquired, and Barton's responses.

112.    During the March 2021 deposition, Barton refused to answer many questions until he had received confirmation that the SEC Commissioners (rather than just the Commission's attorneys who were conducting the deposition) would require him to answer the questions posed. The deposition was accordingly recessed until May 24, 2021.

113.    When the deposition resumed, Walji again represented Barton, with, according to Walji, the assistance of McMurry and others. The subject of the deposition was again the investments offered to the Wall Investors and the disposition of the Investors' funds. For instance, through Barton's deposition, Walji and McMurry learned that Barton had transferred more than $2M in Investor Funds from Wall012 to Carnegie Development, for "basically a loan" to "use on other projects."

114.    Barton also testified that none of the "other projects" for which Investor Funds had been used had generated any income.

115.    Almost a year later, during her March 10, 2022 Commission deposition, Walji also

represented Barton's administrative assistant, Saskya Bedoya.  As in Barton's two depositions, the Commission questioned Bedoya extensively about her role with various Receivership Entities' and those entities' receipt and use of Investor Funds, the process by which the funds were obtained and how the funds were transferred by and between various Entities and used to pay expenses and charges that had nothing to do with the purposes for which the funds were invested.

116.    For instance, during her testimony, Bedoya reviewed several bank statements and admitted making numerous transfers out of accounts owned by the Wall entities into which the Investors had transferred their funds, for use in other projects and other accounts including accounts owned by Carnegie Development, JMJ Development, and Villita, LLC.  Additionally, Bedoya confirmed having used funds from the Wall entities to pay, among other things, development expenses at other properties, commissions for Wall or Fu, and Barton's Am-Ex charges. These uses of course were not permitted by the loan agreements signed by the Investors and Barton on behalf of Carnegie Development.

117.    Through Bedoya's sworn testimony and the bank records used during her testimony, Walji and McMurry, and upon information and belief Marx, Metzger, and Lindauer, were aware that Wall Investor Funds were transferred, impermissibly, to other Receivership Entities and used for expenses and projects other than those for which the funds were invested.

118.    Payments to Defendants were one such impermissible use of Investor Funds by Barton and the various Receivership Entities.

119.    Through her representation of Barton and various Receivership Entities, Lindauer and Marx also knew or had notice of *many* suspicious facts regarding the manner in which the Receivership Entities, including those that made the Transfers to Lindauer, were operated.

120.    Lindauer knew or had notice of the fraudulent nature of transfers made to her. As a

threshold matter, nearly all of transfers made to her by Receivership Entities in the four years preceding the Receivership Order were paid by entities she did *not* represent as debtor's counsel while she *was* representing related entities as debtor's counsel. To the extent that Lindauer was being compensated by non-debtor Barton entities for her professional fees incurred as bankruptcy counsel to debtor Barton entities, she was compensated in violation of the U.S. Bankruptcy Code's requirements for such fees to only be paid pursuant to bankruptcy court orders.

121.    As one specific example of questionable practices by Lindauer, in *In re 2999TC Acquisitions, LLC*, Case No. 21-31954 in the U.S. Bankruptcy Court for the Northern District of Texas, Lindauer represented to the bankruptcy court in her sole fee application that 2999TC Acquisitions, LLC paid her an $11,000 retainer prior to filing its chapter 11 petition on October 29, 2021.[13]

122.    Indeed, 2999TC Acquisitions' bank records show that a check to Lindauer for $11,000 was issued on October 29, 2021 and deposited by Lindauer on November 2, 2021. However, Lindauer never disclosed to the bankruptcy court that on October 29, 2021, 2999TC Acquisitions also transferred $20,000 to her IOLTA account by wire transfer. Further, the bank records show that both payments to Lindauer had been transferred to 2999TC Acquisitions by future fellow Receivership Entity Enoch Investments, LLC on October 29, 2021.

123.    Lindauer had actual or constructive notice of the fraudulent nature of the transfers made to her because she possessed, or had the ability to review, 2999TC Acquisitions' bank records.[14]

---

[13] *See* First and Final Fee Application to Approve Payment of Fees and Expenses of Debtor's Counsel [Dkt. 257] ¶ 6 ("Applicant was paid a retainer of $11,000.00 and, of this amount $2,502.00 was paid for filing fees. A voluntary discount of $1,989.00 was also applied.).

[14] *See, e.g., In re 2999TC Acquisitions, LLC*, Case No. 21-31954 (Bankr. N.D. Tex.), Exhibit #1 (Bank Statement) to Chapter 11 Monthly Operating Report for the Month Ending: 11/30/2021 [Dkt. 66-1]. Curiously, the Monthly Operating Report for the Month Ending 10/31/2021 represented to the bankruptcy court that it included "all bank

124.    Similarly, in *In re BM318, LLC*, Case No. 20-42789 in the U.S. Bankruptcy Court for the Northern District of Texas, Lindauer represented to the bankruptcy court in her sole fee application that she received a retainer of $11,717 prior to BM318 filing its chapter 11 petition on September 1, 2020.[15]

125.    However, bank records show that this retainer was likely paid by Receivership Entity Carnegie Development, LLC—three times. Lindauer received three wire transfers, each in the amount of $11,717—two on September 1, 2020, and one on October 5, 2020.

126.    Lindauer also knew or had notice of fraudulent transfers made by Receivership Entities to third parties because of the way the entities were operated.

127.    For example, in December 2021, 2999TC Acquisitions made two $100,000 transfers to HNGH Turtle Creek, LLC ("HNGH") pursuant to an agreed order in 2999TC Acquisitions' bankruptcy case.[16] However, 2999TC Acquisitions' monthly operating report for that period, which was signed by Lindauer, did not record both transfers, reveals that 2999TC Acquisitions began using an additional Chase bank account that very month, and did not attach the relevant statement from 2999TC Acquisitions' other bank account. A review of both unredacted bank statements would reveal that 2999TC Acquisitions received two $100,000 transfers from two other entities controlled by Barton, including Receivership Entity AVG West, LLC, on the same days those transfers were passed on to HNGH. In the following months, three other entities controlled by Barton (including Receivership Entities Mansions Apartment Homes at Marine

---

statements and bank reconciliations for the reporting period," which would have shown the transfers from Enoch Investments. But the bank statements were not attached despite that representation and despite that chapter 11 monthly operating reports are signed under penalty of perjury. *See id.*, Chapter 11 Monthly Operating Report for the Month Ending: 10/31/2021 [Dkt. 47] at 1.

[15] *See In re In re BM318, LLC*, Case No. 20-42789 (Bankr. N.D. Tex.), First and Final Application to Approve Payment of Fees and Expenses of Debtor's Counsel [Dkt. 110] ¶ 6.

[16] *See In re 2999TC Acquisitions, LLC*, Case No. 21-31954 (Bankr. N.D. Tex.), Agreed Order [Dkt. 64] at 2.

---

**ORIGINAL COMPLAINT**                                                                    **Page 24**

Creek, LLC and JMJ VC Management, LLC) and Barton himself transferred $3.8 million to HNGH, but none of 2999TC Acquisitions' applicable monthly operating reports disclosed any "[d]isbursements made by third party for the benefit of the estate."[17]

128.    Additionally, as early as April of 2020 Lindauer (and by July 2020, Metzger) knew that the Investors alleged Barton and various Receivership Entities had defrauded them and defaulted on their loans. Together with Walji, Lindauer represented seven Wall Entities in defending an involuntary bankruptcy proceeding filed by numerous Investors (the "Involuntary Wall Entity Bankruptcy").  Metzger appeared in the same proceeding on behalf of Barton individually. Through that lawsuit Lindauer, Walji, and Metzger learned that Investors alleged Barton, through Receivership Entities had misappropriated millions in Investor Funds—which the Entities refused to account for or repay despite claims that they intended to do so, knew these Receivership Entities were not paying their debts as they came due, knew that "seventy-seven (77) Petitioning Creditors (and other creditors) were in the dark about what the Debtor did with $33,000,000 in loan proceeds,"[18] as well as many other related and similarly relevant facts.

**D.    Defendants Failed to Properly Advise the Receivership Entities**

129.    While purportedly engaged as counsel for the various Receivership Entities, Defendants (excepting Guenley who never represented any Receivership Entity despite having received more than $1.5MM in Transfers) failed to properly advise their clients.

130.    Although Defendants were aware of the Investors' contentions that their funds were

---

[17] *See In re 2999TC Acquisitions, LLC*, Case No. 21-31954 (Bankr. N.D. Tex.), Chapter 11 Monthly Operating Report for the Month Ending: 1/31/2022 [Dkt. 74], Chapter 11 Monthly Operating Report for the Month Ending: 2/28/2022 [Dkt. 98], Chapter 11 Monthly Operating Report for the Month Ending: 3/31/2022 [Dkt. 104]. Perhaps tellingly, Lindauer stopped signing 2999TC Acquisitions' monthly operating reports in February 2022, although she continued to file them on Barton's behalf.

[18] *In re Wall 07, LLC, et al,* Case No., 20-31131-hdh7 (Bankr. N.D. Tex.), [Doc 35 ¶ 72] (Petitioners' Response to Debtor's Motion to Dismiss).

---

**ORIGINAL COMPLAINT**                                                        **Page 25**

being misappropriated, knew or had notice that Barton was using Investor funds for improper purposes, knew or had notice that the SEC was investigating Barton, JMJ Development and the Wall Entities, Defendants also represented and advised Mr. Barton personally, while also representing and advising Receivership Entities whose interests conflicted with Barton's personal interests.

131.    Barton was interested in holding onto Investor Funds rather than returning or investing those Funds as represented, continuing to obtain funds, through loans that were never going to be repaid, and extorting settlements or other concessions from lenders and creditors, through litigation managed by Defendants.

132.    If properly advised, the Receivership Entities should have been interested in maintaining their corporate existence, observance of corporate formalities, curing regulatory violations in connection with the SEC's investigation, performing contracts in which they engaged, for instance development contracts, purchase contracts, and repaying creditors, including the Investors.

133.    Upon information and belief, however, no Defendant advised any of the Wall Entities, Carnegie, or any other Receivership Entity that any was engaged in securities fraud, or otherwise exposed to liability based on, among other things, the manner in which each operated, and used Investor Funds.

134.    Following the dates on which each Defendant was retained and began to advise the respective Receivership Entities, millions in Investor Funds were illicitly spent, including to pay Defendants.

135.    If any one of the Defendants had properly advised the Receivership Entities, the Entities would not have (a) continued to engage in meritless litigation intended to hinder, delay or

defraud creditors while spending Investor Funds to compensate Defendants; (b) committed securities fraud, (c) participated in the misappropriation and improper spending of the Investor's Funds,  or (d) created or exacerbated additional liability to other creditors through the Transfers.

136.    Competent, disinterested legal advisors would have counseled the Receivership Entities to, among other things, correct their regulatory violations, cease borrowing from lenders and creditors at times when the borrowing Receivership Entity knew or should have known it had no hope of ever repaying such loan(s), cease paying one Entity's obligations with funds obtained from another Entity or Investor Funds, and stop pursuing expensive, but meritless litigation as a delay tactic.

## VI.
## CLAIMS FOR RELIEF

**COUNT 1:**    **FRAUDULENT TRANSFER- Actual Fraud (all Defendants)**

137.    The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 136 of this Original Complaint as if each were separately set forth herein.

138.    On the dates, in the amounts, and in the manner described in **Exhibits C through H**, the Receivership Entities transferred the specific amounts to each of the Defendants (collectively, "the Transfers") with intent to defraud the Receivership Entities' creditors, who include, but are not limited to, the Investors.

139.    As demonstrated by numerous badges of fraud, the Receivership Entities made the Transfers with actual fraudulent intent:

a.    As payments made to facilitate fraud and which resulted in claims held by Investors exceeding the value, if any, of the services provided by each of the Defendants, the Transfers were not made in exchange for reasonably equivalent value. *See S.E.C. v.*

*Resource Dev. Int'l, LLC,* 487 F.3d 295, 301 (5th Cir.2007) (citing *In re Agric. Res. & Tech. Group, Inc.,* 916 F.2d 528, 540 (9th Cir.1990) (Value is assessed in light of the statute's purpose "to protect the creditors"));

b.      The Transfers and their amounts were concealed from creditors;

c.      The Receivership Entities concealed assets, including by diverting monies received from Investors for specific real estate purchases to a myriad of shell entities, and bank accounts;

d.      Each Defendant was an "insider,"

e.      The Transfers were made when the Receivership Entities were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the Receivership Entities would incur, debts beyond their ability to pay as they became due;

f.      The Receivership Entities' debts—including but not limited to claims held by defrauded Investors—greatly exceed their assets;

g.      Many Transfers were made after the respective transferring Receivership Entity had been sued, or after the SEC had begun its investigation;

h.      Many Transfers were made shortly after substantial debts were incurred;

i.      The Receivership Entities engaged in a pattern of sharp dealing, by among things, using the Defendants to file baseless lawsuits intended to tie up ownership of properties the purchase of which the Receivership Entities had defaulted on;

j.      At the time of each of the Transfers, the transferring Receivership Entities had actual knowledge or notice that by making the Transfers, they would be unable to pay

creditors, including claims held by defrauded Investors. *See Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (Holding knowledge that a transaction will operate to the detriment of creditors may be sufficient to establish actual fraudulent intent);

k.    At the time of each Transfer, each of the Receivership Entities was part of a fraudulent enterprise.  Thus, a presumption of fraudulent intent attached to each of the Transfers.  *See In re IFS Fin. Corp.,* 417 B.R. 419, 439 n.15 (Bankr. S.D. Tex. 2009), *affirmed,* 669 F.3d 255 (2012).

140.    Moreover, no Defendant was acting in good faith when he, she, or it received the Transfers since, upon information and belief, each Defendant was aware or had notice of (a) the transfer of Investor funds from Wall Entities and Carnegie to other Receivership Entities; (b) that the only funds available to any Receivership Entity from which Defendants could have been paid were Investor Funds; (c) he or she was being paid by Receivership Entities which either had no assets, or insufficient assets to pay their respective bills; (d) complaints from and/or lawsuits filed by Investors regarding the treatment and disposition of Investor funds; (e) complaints from and/or lawsuits filed by creditors regarding Barton and the Receivership Entities' misappropriation, sharp or fraudulent business practices; and (f) the SEC's investigation.

141.    Creditors, including, but not limited to Investors, exist whose claims arose before and/or within a reasonable time after the Transfers were made, and for whose benefit the Receiver is authorized to assert these claims.

142.    Despite the exercise of diligence, the Receiver was unable to discover this claim until, at the earliest, the late spring or early summer of 2023.

---

**ORIGINAL COMPLAINT**                                                    **Page 29**

143.    Because the Transfers from the Receivership Entities to the Defendants were fraudulent under TUFTA § 24.005(a)(1), the Receiver may avoid the Transfers.

144.    The Receiver requests all available remedies provided by TUFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to Defendants and recovery of reasonable and necessary attorney's fees.

**COUNT 2:    FRAUDULENT TRANSFER - Constructive Fraud (all Defendants)**

145.    The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 136 of this Original Complaint as if each were separately set forth herein.

146.    The Transfers were made when the Receivership Defendants were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or (b) when the Receivership Entities intended to incur, or believed, or reasonably should have believed, that the Receivership Entities would incur, debts beyond their ability to pay as they became due.

147.    The services allegedly provided by any Defendant provided no value to the respective transferor Receivership Entity and instead simply enlarged the pool of defrauded investors and creditors who hold claims against the Receivership Entities. The Receivership Entities, accordingly, did not receive reasonably equivalent for the Transfers.

148.    The Transfers were thus fraudulent pursuant to TUFTA § 24.005(a)(2) and §24.006, et seq.

149.    Creditors, including, but not limited to Investors, exist whose claims arose before and/or within a reasonable time after the Transfers were made, and for whose benefit the Receiver is authorized to assert these claims.

150.     The Receiver requests all available remedies provided by the UFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to the Defendants within the four years preceding the date on which this Complaint is filed, and the recovery of reasonable and necessary attorney's fees.

## COUNT 3: UNJUST ENRICHMENT - CONSTRUCTIVE TRUST (all Defendants)

151.     The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 136 of this Original Complaint as if each were separately set forth herein.

152.     Defendants have been unjustly enriched by the Transfers and property they received from the Receivership Entities.

153.     The Receivership Entities owe restitution to the Investors, and the Defendants' retention of the Transfers is unjust and injures the Receivership Entities.

154.     Accordingly, the Receiver seeks to recover from the Defendants such amounts for the benefit of creditors and defrauded Investors under the equitable doctrine of unjust enrichment and requests the imposition of a constructive trust over all such funds, property and the proceeds thereof.

## COUNT 4:  MONEY HAD AND RECEIVED (all Defendants)

155.     The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 136 of this Original Complaint as if each were separately set forth herein.

156.     The Defendants received the Transfers and other property from the Receivership Entities, that in equity and good conscience belong to the Receivership Entities.  The Receiver seeks to recover the Transfers and other property for the benefit of the Investors and other creditors of the Receivership Entities.

**ORIGINAL COMPLAINT**                                                                 **Page 31**

157.    The Receiver sues for the recovery of all monies had and received by the Defendants.

**COUNT 5:    LEGAL MALPRACTICE/PROFESSIONAL NEGLIGENCE**
**(Walji, McMurry, Marx, Metzger and Lindauer)**

158.    The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 136 of this Original Complaint as if each were separately set forth herein.

159.    Each Defendant had an attorney-client relationship with one or more Receivership Entities and maintained such relationship until the Receiver's appointment in October 2022.

160.    As counsel to the respective Receivership Entities that each Defendant represented, each Defendant owed each Receivership Entity that he or she represented a duty to exercise reasonable and professional care consistent with the standard of care that is expected to be exercised by counsel in providing legal services.

161.    Defendants did not exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.

162.    Instead, as described in detail above, each Defendant breached the standard of care when he or she, among other things, negligently: failed to properly advise the Receivership Entities regarding their use of Investor Funds for purposes other than as provided in the Investors' respective loan agreements; failed to advise the Receivership Entities regarding curing and ameliorating their regulatory violations related to the Investments; ignored red flags about the Receivership Entities' business operations, by which the Investors and creditors were defrauded; upon information and belief, failed to advise any Receivership Entity that it should cease borrowing money and deepening its insolvency when none had any legitimate income but instead was operating based on misappropriated Investor Funds; and continued to advance meritless litigation intended solely to hinder, delay or

defraud creditors.

163.    But for Defendants' negligence, the Receivership Entities would have stopped bleeding cash by paying out millions of dollars in Investor Funds to Barton and Defendants themselves; stopped entering into purchase contracts on properties Defendants knew or should have known would never close and which resulted in significant debt owed by certain Receivership Entities; stopped engaging in litigation intended to benefit Defendants and hinder, defraud or delay creditors; obtained a more favorable result in the Commission's investigation and cured the regulatory violations inherent in the Investments.

164.    As a direct and proximate result of Defendants' respective negligence, Receivership Entities represented by Defendants suffered damages the amount of which will be proven at trial, which the Receiver seeks to recover.

**COUNT 6:**    **BREACH OF FIDUCIARY DUTY**
             **(Walji, McMurry, Marx, Metzger and Lindauer)**

165.    The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 136 of this Original Complaint as if each were separately set forth herein.

166.    The Receiver alleges and hereby incorporates by reference each allegation made in foregoing paragraphs as if each were separately set forth below.

167.    Upon information and belief, each Defendant represented Barton individually in various lawsuits, while also representing various Receivership Entities despite the existence of a direct conflict between Barton's interests and the Receivership Entities' interests.

168.    In the alternative or in addition and upon information and belief, each Defendant advised Barton personally regarding his personal liability on various matters, while also representing various Receivership Entities despite the existence of a direct conflict between Barton's interests and the Receivership Entities' interests.

169.    In breaching their fiduciary duties of loyalty and care, Defendants proximately caused injury to the various Receivership Entities each represented, which the Receiver hereby sues to recover.

170.    Despite the exercise of diligence, the Receiver was unable to discover the claims, including the Transfers and their fraudulent nature until he (a) received access to the Receivership Entities' QuickBooks accounts; (b) obtained bank and other financial records from financial institutions, title companies, and Defendants; and had (c) sufficient time and opportunity to review and evaluate all such information.

171.    Additionally, Barton and the Receivership Entities actively concealed facts and information necessary for the Receiver to discover his claims, as explained above.

172.    As a direct and proximate result of Defendants' respective breaches of duty, Receivership Entities represented by Defendants suffered damages the amount of which will be proven at trial, which the Receiver seeks to recover.

173.    Additionally, the Receiver seeks forfeiture of all fees paid to each Defendant.

**COUNT 7: REQUEST FOR AN ACCOUNTING (all Defendants)**

174.    The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 136 of this Original Complaint as if each were separately set forth herein.

175.    The Defendants are in wrongful possession of substantial monies paid to them by Receivership Entities, which was obtained by the Receivership Defendants from the Investors, through fraudulent and misleading means. The Defendants have each been provided a copy of the Receivership Order which requires their cooperation, and the Receiver requests that each Defendant identify the bank accounts in which the Transfers each received are held, or to fully account for the use of the funds transferred to each.  The Receiver is entitled to an accounting

specifying the location of the Transfers, the persons or entities with control over the Transfers or their proceeds, and the location of any assets purchased with the Transfers.

176.    The Receiver requests that the Court enter an Order compelling the Defendants to file with the Court and serve upon the Receiver an accounting, under oath, detailing all of their assets and all of their funds and other assets received from the Receivership Entities.

## VIII.
## ATTORNEY'S FEES

177.    The Receiver seeks the recovery of all reasonable attorneys' fees and expenses incurred in obtaining judgment against each of the Defendants, as allowed by law or in equity, and those attorneys' fees and expenses required to pursue any appeal.

## IX.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Receiver, Cort Thomas respectfully prays that this Court order disgorgement or alternatively award the Receiver judgment against each Defendant in an amount to be determined through discovery, plus prejudgment and post judgment interest, attorneys fees, expenses, and court costs; order forfeiture of all fees received; order an accounting as requested herein; and that the Court grant such other and further relief as prayed for herein, both at law and in equity, to which he may show himself justly entitled.

Respectfully submitted,

By: _/s/ Charlene C. Koonce_
    Charlene C. Koonce
     State Bar No. 11672850
     charlene@brownfoxlaw.com
    C. Alan Carrillo
     State Bar No. 24109693
     alan@brownfoxlaw.com
    Timothy B. Wells
     Texas Bar No. 24131941
     tim@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, Texas 75225
    T: (214) 327-5000
    F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*