# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                        Plaintiff,<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (A/K/A MICHAEL FU),<br>STEPHEN T. WALL,<br><br>                        Defendants,<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>                        Relief Defendants. | C.A. No.: 3:22-cv-2118<br><br><br>Jury Trial Demanded |

## **COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against

Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie

Development"), Wall007, LLC ("Wall 7"), Wall009, LLC ("Wall 9"), Wall010, LLC ("Wall

10"), Wall011, LLC ("Wall 11"), Wall012, LLC ("Wall 12"), Wall016, LLC ("Wall 16"),

Wall017, LLC ("Wall 17"), Wall018, LLC ("Wall 18"), Wall019, LLC ("Wall 19"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), Stephen T. Wall ("Wall") (collectively, "Defendants"), and Relief Defendants DJD Land Partners, LLC ("DJD") and LDG001, LLC ("LDG001") (collectively, "Relief Defendants"), and alleges as follows:

## SUMMARY OF THE ACTION

1. From approximately March 2017 through June 2019, Barton, a Texas-based real estate developer, raised approximately $26 million from over 100 investors -- most of whom are Chinese nationals -- in unregistered, fraudulent securities offerings related to real-estate investments in Texas.

2. To implement his scheme, Barton partnered with Wall, an experienced Texas home builder, and Fu, a Chinese businessman, to offer and sell investment loans issued by a series of single purpose "Wall" entities. Barton, Wall, and Fu chose this naming convention to capitalize on investors' confidence and trust in Wall, who had previously sold homes to Chinese investors solicited by Fu.

3. Barton formed and controlled the Wall entities, which promised to use the investors' funds, together with funds from the Wall entities themselves, to purchase specific parcels of land at specific prices set forth in the offering materials. Barton would then develop that land into residential lots, and Wall would build homes on the lots and sell them. The Wall entities promised investors they would receive their principal back in two years along with annual interest payments.

4. In reality, Barton, Wall, and Fu inflated the land purchase prices in the offering materials, which enabled them to raise more money from investors; overstated the value of the

2

assets securing the investments; and concealed that the Wall entities were not actually contributing any funds.  Barton, using entities he controlled, then misappropriated nearly all the investor funds, misusing them to, among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions to Fu, pay expenses associated with unrelated real estate development projects, and fund his lifestyle.

5.      The Wall entities were left with little or no assets, the projects were not developed, and the investors were never paid back.

6.      By their misconduct, Defendants violated the antifraud provisions (and Fu also violated the broker-registration provisions) of the federal securities laws.  The SEC brings this action seeking permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, civil penalties, officer and director bars, and all other equitable and ancillary relief the Court deems just and proper.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      The investments offered, purchased, and sold as alleged herein are investment contracts and notes, and thus securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c].

9.      Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate

commerce, and/or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

10.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district.  Defendants also transact business within this district, and several Defendants and Relief Defendants reside in this district.

## DEFENDANTS

11.     Barton resides in Dallas, Texas.  Barton controls Carnegie Development and is its president.  Through Carnegie Development, Barton also controls the Wall Entities, which are defined below.

12.     Fu is a Chinese national who is a permanent resident in the United States and lives in Spring, Texas.  In connection with the offerings, Fu also acted as the CEO of Platinum Investment Corporation, which, upon information and belief, does not exist in the United States, if at all, and is a d/b/a of a Chinese company Fu controls named Yiding (Hangzhou) Investment Management Co. Ltd. ("Fu's company").

13.     Wall resides in Mansfield, Texas.  Wall is a Texas home builder who controls a home-building company called Carnegie Homes, LLC.

14.     Carnegie Development is a Delaware limited liability company with its principal place of business in Dallas, Texas.  Carnegie Development is the managing member for each of the Wall Entities.

4

15.     Wall 7, Wall 9, Wall 10, Wall 11, Wall 12, Wall 16, Wall 17, Wall 18, and Wall 19 are Texas limited liability companies with their principal places of business in Dallas, Texas (each a "Wall Entity;" collectively, the "Wall Entities").  Barton controls the Wall Entities through his control of Carnegie Development, which is the managing member of each Wall Entity.  Barton, Carnegie Development, and the Wall Entities are collectively referred to as the "Barton Defendants."

## RELIEF DEFENDANTS

16.     DJD is a Texas limited liability company with its principal place of business in Dallas, Texas.  Barton controls DJD.  All of the outstanding shares in DJD were assigned to a limited liability company of which Barton is the sole member and a trust for which Barton is the trustee.

17.     LDG001 is a Texas limited liability company with its principal place of business in Dallas, Texas.  Barton controls LDG001 through his control of Carnegie Development, which is the managing member of LDG001.

## FACTUAL ALLEGATIONS

**A.  Background.**

18.     Wall is a Texas-based home builder with over 30 years' experience in the industry.  Fu is a Chinese-based broker who facilitated sales of homes from U.S.-based builders to Chinese investors.  Starting around 2015, Wall sold several homes to Fu's Chinese clients.  Wall and Fu eventually discussed expanding their relationship from residential homes to real estate development projects.

19.     Lacking experience as real estate developers, Wall and Fu turned to Barton to help them sell Texas real estate investments to Chinese investors.  As part of the arrangement, Barton formed single-purpose entities (*i.e.*, the Wall Entities) to receive and control investor funds, purchase specific parcels of land, and later develop the raw land so it could be platted into lots for residential homes.  Wall helped identify land for purchase, helped put together the financials for each project (which included the land prices), and would build homes on the developed land and then sell the homes.   Fu marketed the investments to Chinese investors living in China and the United States.

**B.  The Wall Offerings.**

20.     The investments were offered through a series of investment contracts styled as "Agency and Loan Agreements" ("Loan Agreements") that were issued by each Wall Entity. Though dealing with separate parcels of land, the Loan Agreements followed a similar template and contained similar terms.  Each Wall Entity:

- borrowed a fixed amount from individual investors;

- promised to repay the principal after two years;

- promised to pay interest after the first and second years;

- promised regular progress reports;

- represented that the invested funds would be combined with other investors' funds and funds contributed by the offering entity (or, for Wall 7, contributed by Fu and Wall);

- the combined funds would be used to acquire a specific parcel of land identified in the loan agreement;

6

- specified the purchase price of the land; and

- pledged the Wall Entity's membership interests as collateral to secure the investments.

21.     After the land was acquired, the Barton Defendants and Wall would develop the land into residential housing projects and sell the homes.

22.     Barton oversaw the creation of the single-purpose Wall offering entities that issued and offered the Loan Agreements.  Barton authorized and approved the contents of the Loan Agreements, and he signed the Loan Agreements on behalf of Carnegie Development, the managing member of each of the Wall Entities.  Barton had ultimate authority over the statements in the Loan Agreements, including their content and whether and how to communicate them.

23.     Fu was responsible for finding nearly all of the investors.  Fu, acting directly or through personnel at his company, solicited Chinese investors living in China and in one or more U.S. states via emails, social media applications (*e.g.*, "WeChat"), internet sites, telephone and VOIP calls, and in-person presentations.  Fu and his company solicited investors using the Loan Agreements, written investor presentations, and oral pitches.

24.     Fu, acting directly or through personnel at his company, translated the Loan Agreements to Chinese; created the investor presentations (which incorporated information from Barton and Wall); disseminated the Loan Agreements and investment presentations to prospective investors; held in-person investor presentations in China (some of which Barton or Wall attended); advised prospective investors about the investment terms; and obtained signed

7

Loan Agreements from investors.  Fu also signed the Loan Agreements on behalf of his company as "agent" to administer the Loan Agreement for the investors.

25.     After an investor decided to invest, the process typically worked as follows:

- first, the investor and Fu (on behalf of his company as agent) would both electronically sign the Loan Agreement;

- second, Barton would electronically sign on behalf of Carnegie Development for the Wall Entity offering the investment;

- third, the investor would wire funds directly to a U.S. bank account controlled by Barton that was set up for the special purpose Wall Entity (or, in some cases, to an account controlled by Wall, Barton, or Fu for further remittance to the account for the Wall Entity); and

- fourth, Barton signed a confirmation receipt that was sent to the investor confirming their investment interest.

26.     From March 2017 to at least June 2019, the Wall Entity offerings collectively raised approximately $26 million from over 100 investors:

| Offering | Approx. Offering Dates | Approx. Funds Raised |
|----------|------------------------|----------------------|
| Wall 7   | March - April 2017     | $    2,759,293       |
| Wall 9   | May - July 2017        | $    2,320,091       |
| Wall 10  | September - November 2017 | $    2,279,897    |
| Wall 11  | December 2017 - February 2018 | $    2,024,723 |
| Wall 12  | April - July 2018      | $    3,986,062       |
| Wall 16  | July - November 2018   | $    1,879,804       |
| Wall 17  | October 2018 - February 2019 | $    7,798,471 |
| Wall 18  | March - June 2019      | $    2,363,286       |
| Wall 19  | May 2019               | $       900,000      |
|          |                        | $   26,311,627       |

27.     The Loan Agreements are securities.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other instruments, any "investment contract" or "note."

28.     The Loan Agreements are "investment contracts" under the Securities Act and the Exchange Act.  Investors invested their money to obtain a fixed investment return.  Investors' funds were pooled (and were also supposed to be pooled with the funds from the offering entity). In addition, these were entirely passive investments:  investors had no role or say in the operations or management of the Wall Entities or the underlying real-estate projects.  The investors were entirely dependent upon, and expecting to profit solely from, the Barton Defendants' and Wall's expertise and efforts to manage the real-estate ventures.

29.     The Loan Agreements are also "notes" under the Securities Act and the Exchange Act.  Although not formally styled as such, the Loan Agreements were investment notes in substance and were identified as notes in multiple communications with investors.

30.     No registration statements have ever been filed or in effect as to any offerings of the Loan Agreements.

**C. The Barton Defendants Defrauded Investors.**

31.     The Loan Agreements contained multiple misstatements and omissions:

**1. Misappropriation of Investor Funds.**

32.     Each of the Loan Agreements represented that *all* investor funds would be used to buy a specific piece of land.  For example, the Wall 12 Loan Agreement represented that the investor funds:

> **shall be used to acquire 172 acres located in Fort Worth ETJ, Parker County, State of Texas for residential lot development known as Lyons**

**Ranch ("Property")**.  The Property has a purchase price of $5,250,000 and the balance of funds will be provided by Borrower.  (emphasis added)

33.     These representations were false.  Of the approximately $26.3 million raised, only two Wall Entities (Wall 7 and Wall 9) actually purchased the property described in their respective agreements for a total purchase price of approximately $2.6 million.

34.     Even in those two limited instances, neither Wall 7 nor Wall 9 used its own investors' funds to purchase its property, and instead improperly used commingled funds from one or more other offerings.  None of the other Wall Entities acquired the properties described in their respective agreements.

35.     Instead, the Barton Defendants misappropriated and misused the remaining approximately $23.7 million of investor funds.  The investor funds were commingled with non-investor funds and used to, among other things:

- pay personal expenses of Barton and his family, including credit card bills, rent, and to buy a plane;

- pay Fu undisclosed and unauthorized commissions and fees;

- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);

- to make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;

- acquire properties identified in a Wall offering but in the name of other Barton companies and using funds from a different Wall Entity;

10

- pay professional fees (such as engineering, surveying, and land development) related to, in most cases, properties unrelated to the offerings; and

- make payments to Wall.

36.    As the following chart summarizes, the Barton Defendants misappropriated and misused the investor funds, and even the two Wall Entities that actually purchased the properties identified in their Loan Agreements improperly did so with commingled investor funds:



**Barton Misused Funds to:**

- Acquire Non-Wall Properties
- Acquire Wall Properties for Non-Wall Barton Entities
- Pay Michael Fu and Stephen Wall
- Fund Other Barton Accounts
- Pay Credit Cards & Personal Expenses
- Pay for Professional Services
- Pay Commercial Lenders
- Make Ponzi Payments

$23,700,000

$2,600,000 — 2 Wall Entities Purchased Their Properties (w/commingled funds)

Note: This is not a complete list of how investor funds were improperly spent

37.    Barton controlled the bank accounts for the Wall Entities and Carnegie Development, and he had signatory authority over most of the accounts.  After investor funds were received, Barton caused investor funds to be commingled and transferred among the Barton Defendants' accounts and other bank accounts he controlled.  Barton often directed his administrative assistant to make the transfers.

11

38.     Barton also took out loans on properties acquired with investor funds, and used the loan proceeds (which were also commingled with investor funds) to purchase other properties, to pay undisclosed commissions, to support his businesses, and to fund his lifestyle.

39.     For example, Barton had Wall 7 obtain a short-term bridge loan in the amount of $1,854,000, which was secured by Wall 7's property.  Barton did not use the loan proceeds to improve the property, but rather used a majority of the loan proceeds as a down payment to purchase an unrelated property, transfer money to another Barton-related entity, and to pay legal fees, consulting fees, credit cards, and to make car payments.

40.     When the bridge loan became due a year later, Barton had Wall 7 enter into another loan agreement (for $2,800,000) from a different lender, also secured by Wall 7's property, to pay off the first loan plus interest.  Barton defaulted on this second loan, and by the time he found a third lender to assume the note, Wall 7 owed the principal plus over $440,000 in interest and fees.

41.     Despite promising to make annual interest payments to investors and to return investors' principal, the Barton Defendants did not return the principal to investors as promised, and failed to pay over 80% of the promised interest payments.

42.     Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements, he received copies of Loan Agreements, and he was a signatory to the Loan Agreements.  Barton knew the investor funds were being misused and misappropriated, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes.

43.     Barton's state of mind is imputed to Carnegie Development and the Wall Entities, which are entities he controls.

## 2. Inflation of Property Purchase Prices.

44.     As alleged above, each of the Loan Agreements represented that the Wall Entity would purchase a specific parcel of land with the investor funds.

45.     The Loan Agreements also set forth a specific purchase price that the Wall Entity would pay for that property, and further represented that the offering entity would contribute money to fund the purchase.

46.     For example, the Wall 9 Loan Agreement had a total offering amount of $2,320,000.  It represented that the purchase price for the property was $2,900,000, and the offering entity would fund the difference between the offering amount and the purchase price:

> [The Loans] shall be used to acquire 100 acres located in Venus, Texas for residential lot development known as Venus 100 located on Country Rd 501 and West of FM157 in Venus, Texas ("Property").  **The Property has a purchase price of $2,900,000 and the balance of funds will be provided by Borrower**. (emphasis added)

47.     The representations about the purchase prices were false.  The disclosed purchase prices were inflated.  At the time of the offerings, the Wall Entities had already secured, or were in the process of negotiating actual purchase prices for, the properties that were significantly lower than the prices listed in the Loan Agreements.

48.     In fact, Barton, Fu, and Wall agreed to secretly inflate the purchase prices in the Loan Agreements.

49.     Barton knew that the inflated purchase prices were being provided to investors, because he agreed to the scheme, he was involved in some of the underlying purchase

13

negotiations (or received details on the executed purchase transactions) setting the real prices, and he received and executed Loan Agreements containing the inflated prices.

50.     By misstating the purchase prices, Defendants could use the inflated prices to raise more funds from investors in each offering.

51.     The inflated purchase prices also created the false appearance that the investments were safer than they were by overstating the value of the assets securing the investments.  The Loan Agreements pledged the respective Wall Entity's membership interests to secure the investment.  Defendants led investors to believe that the Wall Entities were obtaining properties at the higher prices that could be sold to pay back investors via their share of the membership interests if necessary, when in fact the properties, and thus the membership interests, had far lower values.

52.     The representations about the contribution of the offering entity's own funds were also false and misleading.  As Barton knew, neither the Wall Entities nor any of the other Barton Defendants contributed funds towards the purchase of the properties.

53.     The inflation of the purchase prices was used to mask this misrepresentation in furtherance of the scheme.  In the two instances where the Wall Entities actually purchased their specified properties, no contribution from the offering entity was necessary to pay the balance of the difference between the offering amount and the purchase price, because the actual purchase price was *lower* than the offering amount.

54.     The following chart summarizes the property purchase prices misrepresented in the offerings compared to the actual (or in cases where the sale did not go through, contracted for) purchase prices:

14

| Offering | Represented Purchase Price | Approx. Real Purchase Price | Wall Entity Contribution |
|---|---|---|---|
| Wall 7 | $3,450,000 | $1,565,300 | $0 |
| Wall 9 | $2,900,000 | $1,014,900 | $0 |
| Wall 10 | $4,400,000 | $2,200,000 | $0 |
| Wall 11 | $2,950,000 | $1,577,125 | $0 |
| Wall 12 | $5,250,000 | $3,626,448 | $0 |
| Wall 16 | $4,850,000 | $3,373,440 | $0 |
| Wall 17 | $11,000,000 | $10,000,000 | $0 |
| Wall 18 | $6,250,000 | $1,984,749 | $0 |
| Wall 19 | $4,189,650 | $1,440,070 | $0 |

### 3. Worthless Guarantee.

55.     The Loan Agreements for many of the offerings also included a purported corporate guarantee by one of Barton's other entities, JMJ Holdings, LLC, for "up to the principal loan amount in the event of default."

56.     Barton approved the guarantees after learning that certain Chinese investors considered the guarantee to be an important consideration for their investment decisions.

57.     However, the guarantees were false and misleading.  As Barton knew, JMJ Holdings, LLC is a dormant company that has never done any business or had any assets.  This was not disclosed to investors.

### 4. Investor Presentations.

58.     The misrepresentations and omissions set forth in the Loan Agreements were also repeated in form and substance in written investor presentations that Fu, directly or through his company personnel, provided to investors to solicit their investments.

59.     Fu's company created these presentations using information provided by the Barton Defendants and Wall.

60.     Like the Loan Agreements, the presentations misrepresented that investor funds would be used to purchase a specific parcel of land, misrepresented the purchase prices, misrepresented that his company and the developer would also be contributing funds to the purchase of the properties, and, in some cases, misrepresented to investors that their investments were guaranteed.

### 5.  Lulling Statements.

61.     The Loan Agreements required the Wall Entities to provide investors quarterly progress reports about the status of the relevant real estate development.  Another entity that Barton controlled (JMJ Development, LLC), acting on behalf of the Wall Entities, sent investors progress reports which misrepresented the actual status of the projects.

62.     For example, a fourth quarter 2019 update sent to investors stated that "all of [the Wall Entities] appear to be tracking with the initial … development plans."  Yet, most of the properties were never actually acquired by a Wall Entity, much less developed as planned.  The quarterly updates also did not disclose that the Barton Defendants had already misappropriated investor funds.

### D.  Fu Actively Participated in The Fraudulent Scheme.

63.     Fu misappropriated investor funds as purported fees and commissions.  The Loan Agreements stated that the borrower (not the investors) would pay an unspecified fee to the agent for its services in administering the investments.  The Loan Agreements did not authorize or disclose the payment of any fees or commissions to Fu or his company from investor funds.  To

16

the contrary, the Loan Agreements represented that all of the investor funds would be used to purchase the specified parcels of land.

64.     Unknown to investors, Fu and Barton had agreed to use investor funds to pay Fu: (a) a flat 6-percent commission based on investments he solicited; (b) a yearly payment based on the difference between each investors' actual interest rate and a 20-percent interest rate; and (c) an additional 10-percent "success fee" after a Wall Entity project was finished and investors were fully repaid.

65.     Between approximately April 2017 and May 2019, Fu received at least approximately $3.76 million of investor funds, or approximately 14% of the total investor funds raised, in purported fees and commissions.  The Barton Defendants paid the majority of this undisclosed amount to Fu with commingled investor funds.  Without telling the investors, Fu took the remainder of the $3.76 million directly from investors' initial investments as offsets to fees he claimed he was owed.

66.     Fu knew investors were promised that their funds would only be used to purchase the properties and not to pay him, because he signed the Loan Agreements, and he (or his company at his direction), prepared the investor presentations and disseminated them and the Loan Agreements to investors.  Fu has admitted under oath that he did not tell investors about his compensation, and that he thought his fees and commissions were commercial terms that they should not know.

67.     Fu undoubtedly knew that investor funds were being used to pay his undisclosed compensation, including because in some instances he took his fees directly from investor funds before they were remitted to the Barton Defendants.

68.     Fu was also integral to the scheme to inflate the property purchase prices.  Fu

used his relationships and expertise with Chinese investors to solicit and obtain investors for the

Wall Entities.  In that capacity, he provided, or caused his company to provide, investors the

Loan Agreements and investor presentations that used the inflated property prices.

69.     Fu knew the property prices were inflated, because he, Barton, and Wall had

reached an agreement to inflate them, he received and disseminated offering materials using the

inflated prices, and he participated in emails with Barton and Wall discussing the inflation of the

purchase prices.

70.     As just one example, on October 24, 2016, Fu sent Wall an email about Wall 7:

> "Bellowings [sic] are the meeting minutes of this morning. . . **for the second 145
> acres deal in Fort Worth, Steve will increase the total price to 3.85M and make
> sure the gap from the final purchasing price is no smaller than 20%**.  Steve will
> send the revised PPT asap.  Please reply this email as confirmation to the above
> terms." (emphasis added)

On November 3, 2016, Wall emailed Fu in response:  "Yes.  Agreed and confirmed."  The email

chain was then forwarded to Barton as part of further discussions about Fu's compensation

arrangement.

71.     The Loan Agreement for the first offering (Wall 7) further stated that Fu and Wall

would provide 20% of the funds necessary to purchase the property for that offering.  But Fu and

Wall did not contribute any funds towards the purchase of the property.  Instead, by raising

money from investors using an inflated purchase price, they did not need to contribute funds to

cover the actual purchase price of the land.  Many of the investor presentations also falsely

claimed that Fu's company would be contributing funds towards the investments.

72.     Fu also provided investors with false assurances and advice about the security of
the investments.  For example, in or around April 2019, Fu told at least one investor during an
in-person meeting in Dallas that the Wall Entity investment was "stable, safe, and zero risk."

**E.  Fu Was an Unregistered Broker.**

73.     In addition to participating in the fraudulent scheme, Fu acted as an unregistered
broker.  Fu was engaged in the business of soliciting investors.  Acting directly or through
personnel at his company that he directly or indirectly supervised, Fu actively found and
solicited nearly all of the investors in the Wall offerings, provided them with the marketing and
offering materials, and closed the sales.

74.     Fu earned transaction-based compensation in the form of undisclosed fees and
commissions based on these sales.

75.     Fu also gave advice to some of the investors about the merits of the investments.

76.     Fu also facilitated, and at times took part in, the negotiations between the
investors and the Barton Defendants of the Loan Agreements, which he signed.

77.     Fu was not registered as a broker or associated with a registered broker-dealer
during the relevant period.  He does not qualify for an exemption or safe harbor from the broker-
dealer registration requirements.

**F.  Wall Actively Participated in The Fraudulent Scheme.**

78.      Wall introduced Barton to Fu, and then authorized Fu and the Barton Defendants
to use his name to legitimize the investments and gain investor trust.  This included using his
name in the Loan Agreements and investor presentations and having investors wire investment
funds to one of Wall's personal accounts.

19

79.     Wall also allowed Barton to misrepresent to investors that Wall was a 50% owner of the Wall Entities' managing member, Carnegie Development. For example, Wall was copied on a February 13, 2017, email in which Barton made this misrepresentation to Fu, which was then incorporated in marketing materials. In truth, although Carnegie Development had a similar name to Wall's home building company (Carnegie Homes), Wall had no ownership interest in the Barton-controlled company.

80.     These "sponsorship" acts were critical to the scheme and important to investors, because they indicated that Wall himself was involved in and backing the offerings. Wall had previously sold homes to some of Fu's Chinese investors, and he had a positive reputation with many of the Chinese investors. Indeed, some of the investors sent their funds directly to Wall.

81.     Wall knew his name was actively being used to promote the offerings, because he: (a) received offering materials bearing his name and listing him as the contact person for the offering entity, (b) discussed the use of his name for the offerings with Fu and Barton, (c) was copied on the February 13, 2017, email in which Barton misrepresented that Wall was a 50% owner of Carnegie Development, (d) traveled to China on one or more occasions to participate in presentations to potential investors, (e) attended events about the Wall Entities' projects, and (f) used bank accounts in his name to receive investor funds.

82.     Wall was also integral to the scheme to inflate the property purchase prices. Wall, who helped choose the land parcels, participated in preparing property financial information that included the inflated prices for many of the subject properties, including for the Wall 7, Wall 9, Wall 10, Wall 11, and Wall 18 properties. He provided that information to

Barton and Fu.  Barton and Fu then incorporated the inflated prices from Wall into the Loan

Agreements and investor presentations.

83.     For example, in March 2017, Wall, through one of his companies, was the

original party to the purchase contract for the Wall 9 property and knew the actual purchase price

was $1,006,800.  Yet, on or about April 18, 2017, Wall emailed Barton a PowerPoint for Wall 9

with an investment summary that showed a land purchase price of $2,900,000.  The inflated

$2,900,000 price was then used in the offering.

84.     Depending on the property, Wall was involved in the underlying land purchase

negotiations or received details on the purchase transactions.  So he knew the actual purchase

prices.  Nonetheless, Wall included inflated prices in the materials he provided to Fu and Barton.

85.     Wall also knew that Fu and Barton were going to use the inflated prices he

provided to solicit investors, because he, Barton, and Fu had agreed to inflate the prices, he

received copies of one or more of the Loan Agreements using the inflated prices, and, as alleged

above, he participated in emails with Barton and Fu discussing the inflation of the purchase

prices.

86.     In addition, the Loan Agreement for the first offering (Wall 7) represented that

Wall and Fu would provide 20% of the funds to purchase the property for that offering.  But

Wall and Fu did not contribute 20% of the funds towards the purchase of the property.  Instead,

Wall provided an inflated purchase price to Fu, which masked Wall's and Fu's lack of

contribution from investors.

87.     Wall also had a pecuniary motive to participate in the scheme.  Barton provided

$500,000 to Wall's company, Carnegie Homes LLC, which Wall claims was a low-interest loan

that Barton made to him to start a new home building business.  Wall was not required to pay back the loan during the course of the scheme, and, in fact, has not paid it back.

88.     Wall also received approximately $200,000 sourced from investor funds.  Under oath, Wall claimed he cannot remember what these payments were for and has no records to substantiate the purpose of the payments.  In addition, a company set up in Wall's wife's name received approximately $300,000 from commingled investor funds shortly after raising funds for Wall 7.

89.     The misstatements, omissions, and deceptive acts alleged herein were material.  A reasonable investor would consider the fact that their funds were used for purposes other than the stated investment purposes important in deciding whether to invest in the offering.  A reasonable investor would also consider the fact that the purchase prices for the land securing their investments had been inflated important in deciding whether to invest in the offering.  A reasonable investor would likewise find the fact that the Defendants were not investing side-by-side with them as promised and the company guaranteeing their investments had no assets important in deciding whether to invest in the offering.

**G. The Relief Defendants Obtained Property With Investor Proceeds.**

90.     LDG001 used commingled investor funds wired to it by the Barton Defendants to purchase the property that the Wall 18 Loan Agreement stated Wall 18 was supposed to purchase.

91.     The Barton Defendants wired the proceeds of a partial sale of a property purchased with investor funds to a title company for credit to DJD to purchase the property that the Wall 11 Loan Agreement stated Wall 11 was supposed to purchase.

92.     LDG001 and DJD did not provide any money or other consideration to investors for the properties purchased with investor proceeds.

93.     Upon information and belief, LDG001 and DJD continue to hold the properties purchased with investor proceeds.

## **FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
(against the Barton Defendants)**

94.     The SEC incorporates by reference each and every allegation contained in the paragraphs above.

95.     By engaging in the conduct alleged above, the Barton Defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:  (a) employed a device, scheme, or artifice to defraud; and/or (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

96.     The Barton Defendants engaged in this conduct intentionally or with severe recklessness.

97.     By reason of the foregoing, the Barton Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder
(against Fu and Wall)**

98.     The SEC incorporates by reference each and every allegation contained in the paragraphs above.

99.     By engaging in the acts and conduct alleged above, Fu and Wall, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange: (a) employed a device, scheme, or artifice to defraud; and/or (b) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

100.     Fu and Wall engaged in this conduct intentionally or with severe recklessness.

101.     By reason of the foregoing, Fu and Wall have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## THIRD CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act
(against the Barton Defendants)**

102.     The SEC incorporates by reference each and every allegation contained in the paragraphs above.

103.     By engaging in the conduct alleged above, the Barton Defendants, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails have: (a)

employed a device, scheme, or artifice to defraud; and/or (b) obtained money or property by

means of an untrue statement of a material fact or an omission to state a material fact necessary

in order to make the statements made, in light of the circumstances under which they were made,

not misleading; and/or (c) engaged in a transaction, practice, or course of business which

operated or would operate as a fraud or deceit upon the purchaser.

104.    With regard to the violations of Section 17(a)(1) of the Securities Act, the Barton

Defendants engaged in the conduct intentionally or with severe recklessness.  With regard to the

violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, they acted at least negligently.

105.    By reason of the foregoing, the Barton Defendants have violated, and unless

enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q].

### FOURTH CLAIM FOR RELIEF

**Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act**
**(against Fu and Wall)**

106.    The SEC incorporates by reference each and every allegation contained in the

paragraphs above.

107.    By engaging in the conduct alleged above, Fu and Wall, directly or indirectly, in

the offer or sale of a security, by the use of any means or instruments of transportation or

communication in interstate commerce or by use of the mails have: (a) employed a device,

scheme, or artifice to defraud; and/or (b) engaged in a transaction, practice, or course of business

which operated or would operate as a fraud or deceit upon the purchaser.

108.    With regard to the violations of Section 17(a)(1) of the Securities Act, Fu and

Wall engaged in the conduct intentionally or with severe recklessness.  With regard to the

violations of Section 17(a)(3) of the Securities Act, they acted at least negligently.

25

109. By reason of the foregoing, Fu and Wall have violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q].

## FIFTH CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act
### (against Fu)

110. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above

111. By engaging in the conduct alleged above, Fu acted as a broker within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(4)] and, directly or indirectly, made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, the securities alleged above.

112. Fu was not registered with, or an associated person of, a firm registered with the SEC in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

113. Fu did not qualify for an exemption from the registration requirements.

114. By reason of the foregoing, Fu violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## SIXTH CLAIM FOR RELIEF

### Equitable claim against the Relief Defendants

115. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

116. The Relief Defendants, directly or indirectly, received funds or property, or benefitted from the use of funds or property, which are proceeds of the unlawful activity alleged

above.  They obtained funds or property, directly or indirectly, from Defendants that were obtained as a result of the securities law violations described herein.

117.    The Relief Defendants have no legitimate claims to such funds or property received, or from which they otherwise benefitted from, directly or indirectly.

118.    The SEC is entitled to an order, pursuant to common law equitable principles – such as disgorgement, unjust enrichment, and constructive trust – and pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], requiring the Relief Defendants to disgorge all of the proceeds they received, either directly or indirectly, from Defendants that were derived from the illegal activities described above.  As a result of the conduct described above, they should disgorge their ill-gotten gains, plus prejudgment interest thereon.

## RELIEF REQUESTED

Therefore, the SEC respectfully requests that this Court:

(a)    Permanently enjoin all Defendants from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b)    Permanently enjoin Fu from violating, directly or indirectly, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(c)    Permanently enjoin Barton, Fu, and Wall from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any securities provided, however, that such injunction shall not prevent

27

Barton, Fu, and Wall from purchasing securities listed on a national
securities exchange for their own personal account;

(d) Order, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)]
and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that
Barton, Fu, and Wall be prohibited from acting as an officer or director of
any issuer that has a class of securities registered pursuant to Section 12 of
the Exchange Act [15 U.S.C. § 78l] or that is required to file reports
pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

(e) Order each Defendant and Relief Defendant to disgorge all ill-gotten gains
and/or unjust enrichment realized by them, plus prejudgment interest
thereon, and for the Barton Defendants to do so on a joint and several
basis;

(f) Order each Defendant to pay a civil penalty pursuant to Section 20(d) of
the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the
Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(g) Grant such further relief as this Court may deem just and proper.

Dated: September 23, 2022
Respectfully submitted,

/s/ *Keefe M. Bernstein*
Keefe M. Bernstein
Texas Bar No. 24006839
David B. Reece
Texas Bar No. 24002810
James E. Etri
Texas Bar No. 24002061
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2607 (KMB phone)
(817) 978-4927 (facsimile)
bernsteink@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission